UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-21606-ALTMAN/Reid

**FRANCISCO CARIAS, JR.**,
*as the personal representative of the*
*Estate of Guillo Carias,*
*on behalf of the Estate, and his Survivors*,

      *Plaintiff*,

v.

**AMERICAN AIRLINES, INC.**,

      *Defendant*.
_____/

**ORDER**

On May 11, 2022, Francisco Carias returned to North Carolina after a family trip in the Dominican Republic. *See* Complaint [ECF No. 1-2] ¶ 6. His flight back to North Carolina had one stop—in Miami. *Ibid.* Unfortunately, while he was walking up the ramp in Miami to board his flight, Mr. Carias injured his back so severely that, when he got to North Carolina, he had to undergo emergency surgery. *Id.* ¶¶ 11–12. Tragically, the surgery was unsuccessful, and Mr. Carias died. *Id.* ¶ 12.

Our Plaintiff—the Estate of Mr. Carias—sued the Defendant, American Airlines, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, asserting one count of negligence and wrongful death under Florida law. *See generally* Complaint. On May 1, 2023, American Airlines removed the case to federal court under the provisions of 28 U.S.C. §§ 1332(a), 1441(a), and 1446. *See* Notice of Removal [ECF No. 1] at 1. On that same day, American Airlines filed a Motion to Dismiss [ECF No. 5], arguing that the Plaintiff's state-law claim is preempted by the Convention for the Unification of Certain Rules for International Carriage by Air (passed on May 28, 1999), commonly known as the Montreal Convention. Having carefully reviewed the Motion, the

Response, the Reply, and the governing law, we now **GRANT** American Airlines's Motion to Dismiss.[1]

## THE FACTS[2]

Francisco Guillermo Carias, also known as Guillo Carias, was a well-known jazz musician. Complaint ¶ 2. In honor of Mr. Carias's contributions to jazz, "in April 2022, the presidency of the Dominican Republic invited Mr. Carias to receive an honorary, private decoration directly from President Luis Abinader." *Id.* ¶ 3. But Mr. Carias was an elderly man with osteoporosis. *See id.* ¶ 13. So, to make his trip "easier and more comfortable," he requested upgrades to first class and wheelchair assistance at the airport on "all legs of his round-trip ticket." *Id.* ¶ 5. Mr. Carias attended the event at the presidential palace on April 28, 2022. *Id.* ¶ 3. On May 11, 2022, he left the Dominican Republic on an American Airlines flight back to North Carolina, with a layover in Miami. *Id.* ¶ 6. Before his departure, "he, again, called the airline in advance and requested a wheelchair and special assistance." *Ibid.* After an uneventful first leg of the trip, Mr. Carias arrived in Miami, where gate agents "transported him to the boarding gate." *Id.* ¶ 7.

Since there was no jet bridge, "an American Airlines agent wheeled Mr. Carias down the tarmac but stopped in front of a ramp that separated Mr. Carias from the plane's entrance." *Id.* ¶ 8. The gate agent then left, leaving Mr. Carias and his wife feeling "helpless . . . since they had received no further instruction." *Id.* ¶ 9. According to the Complaint, the "American Airlines flight crew stood silently at the top of the ramp and looked down at Mr. Carias from the plane door" without offering to help. *Ibid.* Eventually, Mr. Carias walked up the ramp and boarded the plane. "[W]alking the ramp

---

[1] The Motion to Dismiss is ripe for resolution. *See* Plaintiff's Response to Motion to Dismiss (the "Response") [ECF No. 7]; American Airlines's Reply Memorandum in Further Support of Rule 12(b)(6) Motion to Dismiss (the "Reply") [ECF No. 8].

[2] We take the following facts from the Plaintiff's Complaint and accept them as true for purposes of this Order.

without a wheelchair was enough to cause great strain on Mr. Carias' spine, causing severe and debilitating injuries." *Id.* ¶ 11. Mr. Carias underwent emergency surgery when he got back to North Carolina, but the surgery was unsuccessful, and he ultimately passed away. *Id.* ¶ 12.

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## ANALYSIS

In its Motion to Dismiss, American Airlines contends that the "Estate's claims against American [Airlines] are specifically preempted pursuant [to] the Montreal Convention" because "the Montreal convention preempts all local claims that fall within its scope, even if the claims are not cognizable (i.e., even if they do not satisfy the conditions for liability under the Convention.)." Motion to Dismiss at 4. And, American Airlines adds, "[g]iven that the United States and the Dominican

3

Republic are both signatories of the Montreal Convention,"[3] and because Mr. Carias "was allegedly injured during international travel between the Dominican Republic and the United States, the Montreal Convention is applicable in this context and its provisions preempt the Estate's state law wrongful death claim." *Ibid.* We agree with the Defendant that the Plaintiff's wrongful-death claim is preempted by the Montreal Convention. But, to understand why, we must first back up and examine the Montreal Convention's predecessor: The Warsaw Convention.[4]

The Warsaw Convention was signed in 1929 with one primary purpose: to "limit[ ] the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry." *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 546 (1991). "[T]o achieve this aim, the Convention set[ ] forth uniform rules for claims that arise out of incidents that occur during international air transportation." *Marotte v. Am. Airlines, Inc.*, 296 F.3d 1255, 1258–59 (11th Cir. 2002); *see also El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 169 (1999) ("The cardinal purpose of the Warsaw Convention . . . is to achieve uniformity of rules governing claims arising from international air transportation." (cleaned up)). In *Tseng*, the Supreme Court "held that the Warsaw Convention is the exclusive mechanism of recovery for personal injuries suffered on board an aircraft or in the course of embarking or disembarking from an airplane." *Marotte*, 296 F.3d at 1259; *see also Tseng*, 525 U.S. at 161 ("[R]ecovery for a personal injury suffered on board an aircraft or in the course of any of the operations of embarking or disembarking, if not allowed under the Convention, is not available at all." (cleaned up)). The Supreme Court reasoned that "[r]ecourse to local law . . . would undermine the uniform regulation of international air carrier liability that the Warsaw Convention was designed to foster." *Ibid.*

---

[3] That's a true statement. *See Tirado v. JetBlue Airways Corp.*, 2021 WL 5418049, at *3 (D.P.R. July 8, 2021) ("The United States and the Dominican Republic are both signatories to the Montreal Convention[.]").

[4] The Convention for the Unification of Certain Rules Relating to International Transportation by Air, signed at Warsaw on October 12, 1929, 49 STAT. 3000, T.S. 876 (1934), note following 49 U.S.C. § 40105 (1994).

Before the Supreme Court's decision in *Tseng*, the federal circuit courts were divided over whether "a plaintiff who did not qualify for relief under the [Warsaw] Convention could seek relief under local law for an injury sustained in the course of international air travel." *Tseng*, 525 U.S. at 161 & n.3. On one side, the Second and Third Circuits had held that the Warsaw Convention was *not* exclusive—meaning that it did *not* preclude plaintiffs from bringing state-law actions against air carriers when the Convention didn't permit recovery. On the other side, the Fifth Circuit had held that the Warsaw Convention created the *exclusive* cause of action against international air carriers for personal injuries arising from international air travel. *Compare Abramson v. Japan Airlines Co.*, 739 F.2d 130, 134 (3d Cir. 1984) ("Article 24(2) [of the Warsaw Convention] does not by its express terms limit maintenance of actions brought under local law."), *and Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 942 (2d Cir. 1980) (holding that the drafters of the Warsaw Convention "did not intend [the] cause of action to be exclusive"), *with Potter v. Delta Air Lines, Inc.*, 98 F.3d 881, 885 (5th Cir. 1996) (holding that the Warsaw Convention created the "exclusive cause of action" against international air carriers for "personal injuries and death" arising from international air travel).

The Supreme Court resolved this circuit split in *Tseng*, rejecting the Second and Third Circuit's approach and holding that the Warsaw Convention was the *exclusive* mechanism for plaintiffs seeking recovery for personal injuries they sustained during international air travel—whether onboard the aircraft or in the course of embarkation or disembarkation. The Supreme Court reasoned that any other result would contravene the central purpose of the Convention. In its words:

> Our inquiry begins with the text of Article 24, which prescribes the exclusivity of the Convention's provisions for air carrier liability . . . . Article 24 provides that "cases covered by article 17"—or in the governing French text, "les cas prévus à l'àrticle 17"—may "only be brought subject to the conditions and limits set out in th[e] [C]onvention." . . . . In Tseng's view, and in the view of the [Second Circuit] Court of Appeals, "les cas prévus à l'àrticle 17" means those cases in which a passenger could actually maintain a claim for relief under Article 17. So read, Article 24 would permit any passenger whose personal injury suit did not satisfy the liability conditions of Article 17 to pursue the claim under local law . . . .

5

> Construing the Convention [this way], to allow passengers to pursue claims under local law when the Convention does not permit recovery could produce several anomalies. Carriers might be exposed to unlimited liability under diverse legal regimes, but would be prevented, under the treaty, from contracting out of such liability. Passengers injured physically in an emergency landing might be subject to the liability caps of the Convention, while those merely traumatized in the same mishap would be free to sue outside of the Convention for potentially unlimited damages. The Court of Appeals' construction of the Convention would encourage artful pleading by plaintiffs seeking to opt out of the Convention's liability scheme when local law promised recovery in excess of that prescribed by the treaty . . . . Such a reading would scarcely advance the predictability that adherence to the treaty has achieved worldwide.

*Tseng*, 525 U.S. at 167, 171. Finding the Second Circuit's theory incompatible with the goals of the Convention, the Supreme Court held that the Warsaw Convention precluded a passenger from maintaining a state-law action for damages even when the passenger's claim did not satisfy the conditions for liability under the Convention. *Id.* at 176.

In 1999, fifty-two countries, including the United States, signed the Montreal Convention, "a treaty to replace the Warsaw Convention." *Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1308 (11th Cir. 2010). As with its predecessor, the Montreal Convention sets out a uniform system of liability governing international air carriage. *See ibid.* (describing the Montreal Convention as "set[ting] forth uniform rules for international air carriage"). "Given the relationship between [the Warsaw and Montreal Conventions], courts may rely on cases interpreting the Warsaw Convention 'where the equivalent provision of the Montreal Convention is substantively the same.'" *Pettaway v. Miami Air Int'l, Inc.*, 624 F. Supp. 3d 1268, 1276 n.4 (M.D. Fla. 2022) (Corrigan, J.) (quoting *Ugaz v. Am. Airlines, Inc.*, 576 F. Supp. 2d 1354, 1360 (S.D. Fla. 2008) (Moreno, C.J.)).

As relevant here, the Warsaw and Montreal Conventions include very similar provisions on the issue of exclusivity. So, for instance, Article 24(1) of the Warsaw Convention provides as follows:

> In the carriage of passengers and baggage, any action for damages, however founded, can only be brought subject to the conditions and limits set out in this Convention, without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights.

6

Warsaw Convention, art. 24, § 1. The corresponding provision in the Montreal Convention, Article 29, reads this way:

> In the carriage of passengers, baggage and cargo, any action for damages, however founded, *whether under this Convention or in contract or tort or otherwise*, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights.

Montreal Convention, art. 29 (emphasis added). These provisions are "substantively the same," and courts interpreting them have consistently held that the Warsaw and Montreal Conventions express an "identical preemptive effect." *Ugaz*, 576 F. Supp. 2d at 1360; *see also Paradis v. Ghana Airways, Ltd.*, 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004) (finding that the "preemptive effect is identical regardless of whether the Montreal Convention or the Warsaw Convention" applies because "Article 29 of the Montreal Convention simply clarified the language of the Montreal Protocol's amendment to Article 24(1) of the Warsaw Convention").

Notably, the Eleventh Circuit has "enforced the Montreal Convention's preemptive effect by dismissing a plaintiff's state law claims." *Pettaway*, 624 F. Supp. 3d at 1282 (first citing *Eli Lilly,* 615 F.3d at 1313 n.4 ("Article 29 of the [Montreal] Convention preempts state law actions falling within its scope."); and then citing *Jacob v. Korean Air Lines Co. Ltd.*, 606 F. App'x 478, 480 (11th Cir. 2015) (per curiam) (affirming the district court's dismissal of state-law conversion claim "on the ground that it was preempted by the [Montreal] Convention")).

Relying on this guidance, district courts in the Eleventh Circuit have likewise enforced the Montreal Convention's preemptive effect by dismissing the state-law claims of international-air plaintiffs. *See, e.g.*, *Ugaz*, 576 F. Supp. 2d at 1360 ("For all air transportation to which the Montreal Convention applies, if an action for damages falls within . . . the treaty's damage provisions, then the treaty provides the sole cause of action under which a claimant may seek redress for his injuries."); *Pettaway*, 624 F. Supp. 3d at 1282 (dismissing the Pettaways' state-law claims because "the Montreal

7

Convention applies to the Pettaways' claims arising from the Flight 293 incident, [so] the Montreal Convention preempts their state law claims"); *Llanes v. Iberia Air Lines of Spain, S.A.*, 2008 WL 11417407, at *3 (S.D. Fla. June 30, 2008) (Ungaro, J.) ("In keeping with the Convention's goals, the [c]ourt finds that [p]laintiffs' state law claims are preempted by the Convention, thus enhancing the uniformity of the air carrier liability scheme."); *DHL Glob. Forwarding (China) Co., Ltd. v. Lan Cargo, S.A.*, 2019 WL 13067929, at *5 (S.D. Fla. June 17, 2019) (Cooke, J.) ("As for the Convention's preemptive effect, the language of Article 29 is as clear and expansive as the skies themselves . . . . [F]or all air transportation to which the Montreal Convention applies, if an action for damages falls within one of the treaty's damage provisions, then the treaty provides the sole cause of action under which a claimant may seek redress for his injuries."); *Hicks v. Avianca Inc.*, 2023 WL 4743037, at *3 (S.D. Fla. July 25, 2023) (Gayles, J.) (same); *Hedetniemi v. Am. Airlines, Inc.*, 2018 WL 7824483, at *3 (S.D. Fla. Nov. 7, 2018) (Moore, C.J.) (same).

We recognize that a tiny minority of our colleagues have decided not to enforce the Montreal Convention's preemptive effect and have allowed state-law claims to proceed, subject to the Convention's limitations on liability. *See, e.g.*, *Adler v. WestJet Airlines, Ltd.,* 31 F. Supp. 3d 1381, 1390 (S.D. Fla. 2014) (Cohn, J.) ("The Court thus views the Montreal Convention as permitting a plaintiff to proceed on state law claims alleging personal injury harms within the scope of the Convention, subject to the Convention's limitations on liability . . . . Therefore, although the Adlers' claims fall within the scope of the Montreal Convention, they may proceed on their claims subject to the Convention's limitations on liability."). Respectfully, we disagree. Our holding today effectuates the driving purpose of the Montreal Convention, which is to create a uniform liability scheme for accidents that occur during international travel.

Turning to the facts of this case, we find that the Estate's cause of action falls squarely within the scope of the Montreal Convention. As we've said, "[b]oth the Supreme Court and the Eleventh

8

Circuit have made clear that the Montreal Convention 'is the exclusive mechanism of recovery for personal injuries suffered on board an aircraft or in the course of embarking or disembarking from an airplane.'" *Vanderwall v. United Airlines, Inc.*, 80 F. Supp. 3d 1324, 1335 (S.D. Fla. 2015) (Bloom, J.) (quoting *Marotte*, 296 F.3d at 1259). In our case, it's undisputed that Mr. Carias was injured while traveling internationally between the Dominican Republic and the United States. *See* Motion to Dismiss at 2 ("Carias sustained his injury while boarding flight [sic] during his international return travel from the Dominican Republic."); Complaint ¶ 6 (noting that, on May 11, 2022, Mr. Carias left the Dominican Republic on an American Airlines flight back to North Carolina, with a layover in Miami). The Complaint also alleges that Mr. Carias was injured while "walking up the ramp" to board the plane. *See* Complaint ¶¶ 6, 13. In other words, Mr. Carias was injured during international air travel and "in the course of any of the operations of embarking or disembarking." *Tseng*, 525 U.S. at 161; *see also Gezzi v. British Airways, PLC*, 991 F.2d 603, 604 (9th Cir. 1993) (holding that the claim of a plaintiff who was injured on the stairs between the tarmac and the plane fell within the ambit of the Warsaw Convention because the stairs were part of "the operations of embarking"). The Plaintiff's cause of action is therefore governed by the Montreal Convention, which provides the *exclusive* remedy for the Estate's claims.

Resisting this interpretation, the Estate advances three arguments—all unavailing. *First*, the Estate contends that its claims aren't governed by the Montreal Convention because Article 17 of the Convention "imposes liability on an aircraft carrier when an '*accident*' causes a passenger's death or bodily injury in an international flight," and (the Estate says) no "accident" occurred here. Response at 1–2 (emphasis added). In saying so, the Estate points to *Air France v. Saks*—a Supreme Court case that predates *Tseng*—for the proposition that an accident is "an unexpected or unusual event or happening that is external to the passenger," *not* "the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." 470 U.S. 392, 405–6 (1985). According to the Estate,

9

"there are no allegations that claim an unexpected or unusual event [occurred in this case]. In fact, the event that occurred is quite usual." Response at 3. We reject the Estate's *first* argument for two reasons.

*One,* the events as alleged in the Complaint indicate that an "accident" did occur. The Estate is correct that, under Article 17 of the Convention, "a carrier is liable only for damage sustained when the 'accident' which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." *Ugaz*, 576 F. Supp. 2d at 1360. And the Eleventh Circuit has said that, to satisfy Article 17, "an accident must have occurred." *Marotte*, 296 F.3d at 1259. But the Supreme Court has expressly held that a flight crew's "inaction" (or "refusal to assist") *does* constitute an "accident" within the meaning of the Warsaw Convention.[5] *See Olympic Airways v. Husain*, 540 U.S. 644, 654, 656 (2004). In *Husain*, the deceased passenger, Dr. Hanson, "suffered from asthma and was sensitive to secondhand smoke." *Id.* at 647. So, before his flight, he "request[ed] nonsmoking seats." *Ibid.* After boarding the plane, he discovered that his seat was "located only three rows in front of the economy-class smoking section." *Ibid.* Within a few hours, he was "surrounded by ambient cigarette smoke," and his wife asked the flight crew if he could switch seats. *Ibid.* The flight crew refused, and Dr. Hanson died onboard the plane. *Id.* at 648. The Supreme Court held that the flight attendants' refusal to provide assistance to Dr. Hanson constituted an "accident" within the meaning of the Warsaw Convention because the "relevant 'accident' inquiry under *Saks* is whether there is an unexpected or unusual event or happening. The rejection of an explicit request for assistance would be an 'event' or 'happening' under the ordinary and usual definitions of these terms." *Id.* at 654–55 (cleaned up).

---

[5] This principle has carried over to cases interpreting the Montreal Convention. *See, e.g.*, *Armstrong v. Hawaiian Airlines, Inc.*, 416 F. Supp. 3d 1030, 1041 (D. Haw. 2019) (holding that, under Article 17 of the Montreal Convention, "[a]n 'event or happening' can take the form of action or inaction").

Our facts are similar. In our case, the Estate alleges that American Airlines's flight crew and gate agent failed to assist Mr. Carias after he *twice* requested a wheelchair and special assistance for his preexisting health conditions:

> In order to make the trip easier and more comfortable for Mr. Carias, he requested upgrades to 1st class on all legs of his round-trip ticket, as well as wheelchair and wheelchair assistance at the airport. Mr. Carias' request was acknowledged . . . . On his return to Raleigh, NC via Miami on May 11, he, again, called the airline in advance and requested a wheelchair and special assistance . . . . When the gate agent departed, Mr. Carias and his wife felt quite helpless but understood they would have to board the aircraft on their own, especially since they had received no further instruction. The American Airlines flight crew stood silently at the top of the ramp and looked down at Mr. Carias from the plane door but offered nothing in the way of help. And so, Plaintiff's 76 year-old wife walked to the side and slightly behind Mr. Carias as he traversed the narrow ramp up to the plane door, with no help from any of the flight crew.

Complaint ¶¶ 5–6, 9–10. Accepting these factual allegations as true—and taking them in the light most favorable to the Plaintiff—we find that American Airlines's failure to assist Mr. Carias after repeated requests for a wheelchair (and wheelchair assistance) constituted an "accident" for purposes of Article 17 of the Montreal Convention.

*Two*, this whole debate over whether an accident occurred is ultimately immaterial to the question of preemption—which is to say that the Estate's first argument reflects a fundamental misunderstanding of the law. The fact is that, *even if* the airline's inaction *didn't* constitute an Article 17 "accident," the Estate's claims would *still* be preempted because (as we've said) the Montreal Convention "precludes a passenger from maintaining an action for personal injury damages under local law [even] when her claim does not satisfy the conditions for liability under the Convention." *Tseng*, 525 U.S. at 675; *see also Siddiq v. Saudi Arabian Airlines Corp.*, 2013 WL 2152566, at *4 n.5 (M.D. Fla. Jan. 9, 2013) (Fawsett, J.) ("The Supreme Court of the United States has held that Article 24 provides a 'rule of exclusivity' prohibiting suits under local laws even when a passenger cannot establish a covered air carrier's liability under the Montreal Convention."). For these two reasons, then, we reject the Estate's contention that its claim isn't governed by the Montreal Convention.

11

The Estate's *second* argument fares no better. Here, the Estate teases us with the following section header: "Dismissal Is Not Proper Because the Montreal Convention Merely Discusses Damages, and Nothing More." Response at 3. Bafflingly, however, the section that follows doesn't advance *any* arguments about damages. Instead, in this second argument, the Estate appears to suggest that, *because* we have subject-matter jurisdiction over this case, the Montreal Convention *cannot* preempt the Plaintiff's state-law claim. "The Convention," the Estate insists, "provides the exclusive remedy for injuries or damage to individuals incurred on board international flights . . . . Under the terms of the Convention, this remedy can be pursued only in certain jurisdictions . . . . In this case, because American Airlines operates services in this particular district, the action is rightfully brought in this Court." Response at 3–4. This argument is a nonstarter. For one thing, "American is not contesting this Court's exercise of subject matter jurisdiction." Reply at 5. In fact, it was American Airlines that removed this case to our Court on the basis of our diversity jurisdiction. *See* Notice of Removal at 2. For another, the issue of subject-matter jurisdiction is entirely separate from—and has nothing to do with—the question of preemption.[6] Put differently, a federal court can—and often will—have subject-matter jurisdiction over a case, even though the state-law claims at issue in the case are preempted by a federal statute. *See, e.g.*, *Vanderwall*, 80 F. Supp. 3d at 1335 & n.1 (holding that the Montreal Convention preempted the plaintiff's state-law claim *even though* the court had diversity jurisdiction over that claim).

*Third*, the Estate argues that the Montreal Convention "does not preempt Plaintiff's state law claims in its [sic] entirety" because "Article 29 of the Montreal Convention . . . preempts those claims only to the extent that they exceed the limits set by the convention . . . . [T]here is, literally, a chorus

---

[6] *See, e.g.*, *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1179 (11th Cir. 2006) ("Unlike complete preemption, which is jurisdictional, defensive preemption is a substantive defense, justifying dismissal of preempted state law claims.").

12

of holdings that show that the Montreal Convention does not completely preempt state law claims." Response at 4–5. Here, the Estate has confused the doctrines of complete and ordinary preemption. As the Eleventh Circuit has explained, the term "preemption" has "enkindled a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption. Stated simply, complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court." *Blab T.V. of Mobile, Inc. v. Comcast Cable Commc'ns, Inc.*, 182 F.3d 851, 854–55 (11th Cir. 1999). So, to the extent the Plaintiff is arguing that the Montreal Convention doesn't provide a basis for removal under the doctrine of complete preemption, that simply isn't an issue in our case because American Airlines removed the Plaintiff's claim under our *diversity* jurisdiction, *see* Notice of Removal at 2, and because the Plaintiff *never* filed a motion to remand the case back to state court, *see generally* Docket, and *never* suggested that we lack diversity jurisdiction over this case. Nor could the Estate have argued otherwise. After all, the parties are completely diverse—the Estate sits in North Carolina, while American Airlines is a Delaware corporation with its principal place of business in Texas, *see* Notice of Removal ¶ 11—and the controversy is for much more than $75,000, *see id.* ¶ 15. For purposes of our case, then, the doctrine of complete preemption is neither here nor there. And, to the extent that the Estate takes issue with our *ordinary*-preemption analysis, we've already explained why its "state law claim is displaced by the Montreal Convention under an ordinary preemption analysis." *Fernandez v. Am. Airlines, Inc.*, 2019 WL 13258037, at *2 (S.D. Fla. Oct. 7, 2019) (Williams, J.).

Having addressed all three of the Plaintiff's arguments—and having found them unconvincing—we hold that the Plaintiff's state-law negligence and wrongful-death claim is preempted by the Montreal Convention.[7]

\*\*\*

After careful review, therefore, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendant's Motion to Dismiss [ECF No. 5] is **GRANTED**.

2. The Clerk of Court is directed to **CLOSE** this case.

3. All pending deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on October 3, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

[7] And we won't give the Plaintiff leave to amend because it never asked—either in its Response or in a separate motion for leave to amend—for permission to amend its claims. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."); *Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.").